2023 IL App (1st) 210642

SECOND DIVISION
September 12, 2023

No. 1-21-0642

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 321 |
| | ) | |
| RUBEN MYERS, | ) | Honorable |
| | ) | Domenica A. Stephenson, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1 After a jury trial, defendant Ruben Myers was found guilty of the armed robbery and aggravated battery of the victim, Jose Olvera, and those convictions were previously affirmed on direct appeal. In this appeal, defendant challenges the trial court's first-stage dismissal of his postconviction petition, arguing that he set forth the gist of a constitutional claim of ineffective assistance of counsel.

¶ 2 The record shows that, prior to defendant's 2015 trial, the trial court allowed the State's motion to take a videotaped evidence deposition of the victim, who had terminal cancer. The victim's deposition was taken on September 20, 2013. The deposition was conducted on the same

day as the victim's testimony was presented as proof of other crimes evidence in another case against defendant involving a different victim, Esquiel Luna (the Luna trial). During the cross-examination portion of the deposition, the victim had a medical emergency, and an ambulance was called. The victim died nine days later.

¶ 3 Prior to trial, defendant filed a motion to bar the videotaped deposition from being introduced at trial based on it being incomplete. The court denied defendant's motion, finding that defendant had the opportunity for "substantial cross-examination" during the deposition.

¶ 4 Also before trial, the State moved to allow the introduction of prior testimony from Alvaro Rodriguez, who also had testified in the Luna trial. The State asserted that it recently learned that Rodriguez had moved to Mexico and did not intend to return, and it requested that the court find him to be an unavailable witness. The State's motion was granted over defendant's objection.

¶ 5 Before the State called its first witness in the trial in the instant appeal, defense counsel noted the defense's continuing objection to the introduction of the victim's deposition testimony and Rodriguez's testimony.

¶ 6 The State then called Rosemary Olvera, who testified that her husband, the victim, had passed away from cancer on September 29, 2013. Prior to the offense, in March 2012, the victim received a liver transplant. Later, on September 4, 2012, Mrs. Olvera learned her husband was in the hospital after being beaten. Mrs. Olvera testified that her husband always wore a chain around his neck, a ring, and a gold bracelet with the Virgin Mary on it. On cross-examination, Mrs. Olvera acknowledged that the victim's transplant was due to cirrhosis of the liver, and she believed that the cirrhosis was a result of the use of alcohol. She also testified, however, that the victim stopped drinking alcohol a "long time" before 2012 because he was on a waiting list to receive a liver transplant and a person could not receive such a transplant if that person consumed alcohol.

¶ 7    The parties then stipulated to the introduction of the pretrial videotaped deposition of the victim. The video deposition was admitted into evidence and published to the jury.

¶ 8    In that video deposition, the victim testified that on September 4, 2012, around noon, he went to Miska's Liquor (Miska's) at or about 4105 West 25th Place in Chicago to buy some lottery tickets. As the victim was leaving Miska's, a man approached and engaged the victim in conversation. During the deposition, the victim identified defendant as the man with whom he spoke. The victim testified that defendant asked him if he was interested in buying some hub caps, the victim responded affirmatively, and defendant told the victim to follow him. The victim followed defendant for about three minutes from the store to the corner of 25th Place and Karlov Avenue, about a block away from Miska's. At that point defendant pushed the victim to the ground, and two other men then came up and hit the victim with a "4 by 4" piece of wood. Defendant stood about five feet from the victim as he was being beaten and did not try to help or stop the men from beating him. The victim testified that the men took $125 in cash, a gold ring, and a gold bracelet. He further testified that he lost consciousness at some points during the beating, and he did not know how long the beating lasted. However, he estimated that the beating lasted only a "[s]hort time."

¶ 9    The victim sustained injuries to his head requiring 17 staples. He also testified that he had undergone a liver transplant prior to the beating and, as a result of the beating, his liver was damaged and needed to be repaired. Additionally, the victim sustained a broken arm, broken leg, and injuries to his hand, which required surgery to put in a screw.

¶ 10    Before defendant pushed the victim to the ground, he was able to see defendant's face. It was daylight outside, and nothing covered defendant's face. On the day of the beating, he spoke to police and described defendant as "white Mexican," 6'2", about 200 pounds, and 28 years old.

3

Later, on November 27, 2012, the victim went to the police station to view a lineup, during which he identified defendant as the person who pushed him to the ground.

¶ 11    On cross-examination, defense counsel asked the victim whether he drank alcohol, and the following exchange occurred:

> "A. I used to.
>
> Q. When did you stop?
>
> A. A long time ago.
>
> ***
>
> Q. How long?
>
> A. Like 12 year[s].
>
> Q. 12 years ago you stopped?
>
> A. Yeah.
>
> Q. So, you haven't had a drink of alcohol in 12 years?
>
> A. I probably had one beer.
>
> ***
>
> Q. When did you have that?
>
> A. I don't know.
>
> Q. Was it one year ago or two years ago or three years ago?
>
> A. No, no, no. 19, 18 down.
>
> Q. 18 years ago?
>
> A. Yeah.
>
> Q. You had one beer?
>
> A. Yeah.



Q. But, you quit 12 years ago?

A. Yeah, 12 years.

Q. Okay. So *** if you quit 12 years ago, you were drinking up until 12 years ago, right?

A. After 12 years ago. So after 12 years ago I didn't touch it.

Q. Well, when—the day you got beaten on September 4th of 2012, you had been drinking that day, right?

A. Yeah.

Q. You did drink that day, right?

A. No, not that I remember.

Q. Not that you remember?

A. No. I know I don't.

Q. Do you—you don't remember or you—

A. I didn't. I don't remember.

Q. You don't remember?

A. Yeah.

Q. Okay. So, *** if the police said that you were intoxicated would they be wrong or—

A. Yeah.

Q. —is it possible?

A. I wasn't intoxicated. They were *** wrong."

¶ 12    The victim also testified that he used drugs "a long time ago," which he also estimated was more than 12 or 13 years ago. Defense counsel then questioned the victim about the timing of, and

5

defendant's role in, the offense. The victim acknowledged that he did not hear defendant say anything to the men and did not hear the men say anything to defendant. The victim also acknowledged that defendant did not participate in the beating once the victim was on the ground.

¶ 13    Defense counsel then began to ask the victim another question but stopped and asked the victim if he was "all right." The victim responded, "Oh, hurts. Heart, heart. My heart." The deputy sheriff asked the victim if he needed an ambulance, and the victim responded, "Hurry." The deputy sheriff called for an ambulance, and the videographer noted that they were "going off the record."

¶ 14    The State then called Caroline Ocasio, who testified that she worked as a bartender at Miska's. Ocasio testified that she had trouble remembering things around 2012 because she had been a heavy user of heroin and crack cocaine at that time. The State asked Ocasio if on September 4, 2012, defendant came into Miska's and asked if she wanted to buy a gold bracelet. Ocasio responded that she "d[id]n't remember." Ocasio also testified that she did not remember telling Detective Anthony Pulcanio on November 24, 2012 that defendant came into the store and asked if she wanted to buy a gold bracelet. The State showed Ocasio a signed form, as well as a group of photographs with one photograph circled and initialed. Ocasio agreed that both the signature and initials were in her handwriting, but she did not remember signing the form or initialing the photograph. Ocasio also denied telling Detective Pulcanio that she would not testify against defendant because she feared retaliation.

¶ 15    The parties then stipulated to the testimony of Rodriguez, as well as his unavailability. In that stipulated testimony, Rodriguez stated that he worked at Miska's in September 2012 and made an in-court identification of defendant, who he knew as "Polaco." Rodriguez testified that defendant was a regular customer at Miska's. Rodriguez admitted that he identified Polaco to Detective Pulcanio by circling a photograph in a photo array and putting his initials on the

6

photograph. Rodriguez denied, however, that he told the detective that defendant tried to sell him a bracelet. He admitted telling Detective Pulcanio that he feared retaliation and would not testify.

¶ 16    The State then called Detective Pulcanio, who testified that he was assigned to investigate the September 4, 2012, beating and robbery of the victim and that he first met with the victim on September 14, 2012. During the course of his investigations, the detective obtained the nickname "Polaco" and learned that the nickname referred to defendant. Defendant was arrested, and Detective Pulcanio contacted the victim to view a physical lineup. The detective testified that, when the victim came into the room to view the lineup, he "immediately and without hesitation *** picked [defendant] and said, 'that's him.' " Detective Pulcanio described the victim as "visibly shaken" and "distraught" after the lineup.

¶ 17    Detective Pulcanio testified that during his investigation he went to Miska's and spoke with Ocasio, who told him that a person by the name of Polaco came into the store and asked her if she wanted to buy a gold bracelet. She did not further describe the bracelet as having any insignia, and she did not tell the detective an exact date. Ocasio told Detective Pulcanio that Polaco came in to Miska's in "early September," and on cross-examination, the detective agreed that could refer to a time period prior to the September 4, 2012, offense. Detective Pulcanio further testified that Ocasio told him that she would not appear in court because she feared retaliation. Detective Pulcanio also testified that he separately interviewed Rodriguez, who also told him that Polaco came into the store in early September and tried to sell him a gold bracelet. Rodriguez also expressed that he feared retaliation and would not appear in court.

¶ 18    Detective Pulcanio further testified that he returned to the store later that day and separately presented both Ocasio and Rodriguez with photo arrays. Detective Pulcanio stated that, whenever he presents a photo array, he asks the person if they "recognize anybody in these pictures" and, if

7

so, he instructs them to "place a circle around their picture, initial it, and date it." Regarding Ocasio, the detective stated that she circled the photograph of defendant from the photo array. The prosecutor then asked:

"Q. When Ms. Ocasio identified the defendant in the photo array, what did she identify him as?

A. As the person she knows as Polaco.

Q. That's the same person she told you came into the store to try to sell her the gold bracelet?

A. Yes."

¶ 19 Detective Pulcanio testified that Rodriguez was also presented with the photo array. The prosecutor asked:

"Q. Who did he recognize in the photo array?

A. Ruben Myers.

Q. Who did he recognize Ruben Myers as?

A. The person he knows as Polaco.

Q. Is that the same person that he told you came into the store and tried to sell the gold bracelet to him?

A. Yes."

¶ 20 On cross-examination, Detective Pulcanio acknowledged that the general offense case report authored by a different officer indicated that the victim was intoxicated.

¶ 21 Michell Reilly, a paramedic with the Chicago Fire Department, testified that on September 4, 2012, she was dispatched to treat a battery victim. Reilly located the victim, who was alert and able to communicate with Reilly, and transported him to Mount Sinai Hospital. Based on her

8

observations, Reilly did not believe the victim to be intoxicated. Reilly agreed that someone who had head trauma, like the victim, could have symptoms similar to being under the influence of alcohol.

¶ 22     Dr. Amardeep Singh, an emergency room physician who treated Olvera, testified to the victim's various injuries. Dr. Singh also testified that the victim was asked whether he took any drugs or alcohol recently, and the victim said no. As part of the hospital protocol, the victim's blood was sent for testing, which revealed no level of alcohol in his system. The test was conducted at 3:05 pm, and the doctor explained that, if the victim had been intoxicated within the last hour or two, the test would have revealed some sign of alcohol in his blood. The doctor also testified that head trauma, like that which was sustained by the victim, could cause symptoms similar to intoxication.

¶ 23     On cross-examination, the doctor read a note from another doctor's evaluation of the victim, stating that the victim was "force fed *** drugs." Dr. Singh agreed that it was likely that the note was recounting a statement made by the victim. Dr. Singh testified that, if a patient made that report, a drug test normally would be performed. The doctor acknowledged, however, that the victim's chart indicated that his blood was tested for alcohol and did not indicate that a drug screen was conducted.

¶ 24     The State rested, and the defense called Veronica Hernandez, who lived across the street from Miska's. In the early afternoon of September 4, 2012, Hernandez was having a garage sale at her house when she heard someone screaming for help. Initially, she "thought it was just someone playing around," but she realized they were serious when the screams "kept on going and going." After walking to the front of her house, she saw a man on the ground and two others beating him with a long stick or piece of wood. She did not recognize any of them. Hernandez

9

testified that there were bystanders watching the beating and not intervening, but she could not recall how many bystanders were there. Hernandez testified that she did not see defendant in the area. She explained that she knows defendant from the neighborhood but is not friends with him.

¶ 25    Hernandez yelled at the attackers to "let him go, leave him alone." As she advanced toward them, they ran away. She reached the victim, who told Hernandez, "They robbed me, they robbed me." Hernandez told the victim to lie down and stayed with him until paramedics arrived. She did not see defendant at any point.

¶ 26    On cross-examination, Hernandez testified that defendant is friends with her cousin. She acknowledged that she did not see the beginning of the beating and that she did not know if anyone else was there prior to her arrival, but she estimated it was less than a minute from when she first heard screams to when she saw the two men beating the victim.

¶ 27    The parties stipulated to the testimony of Chicago police officer Daniel Simons, who would testify that he arrived at the scene, observed the victim being treated, and prepared an incident report, in which he wrote that the victim was intoxicated.

¶ 28    The parties then stipulated to additional testimony of the victim, which was taken from the victim's sworn testimony in the Luna trial. The victim testified generally consistently with his account set out in the video deposition. He stated that on September 4, 2012, around noon, he went to Miska's to purchase lottery tickets. As the victim was leaving, defendant approached him and asked if the victim needed any hubcaps for his truck. The victim recognized defendant, having seen him at Miska's once before, but he did not know his name. The victim agreed to look at the hub caps, and defendant told the victim, "Follow me." The victim followed him to the street corner. The victim testified that there were two other men with defendant on the street.

10

¶ 29    When they got to the corner, defendant suddenly pushed the victim. The victim fell to the ground, and defendant's two companions began beating him. They kicked him and hit him with a wooden board. Defendant did not participate, but he made no effort to help, nor did he tell his companions to stop. Defendant watched the beating with his arms crossed over his chest, and the victim described defendant as looking "proud." Defendant watched the beating for a while, then ran away.

¶ 30    The victim testified that the beating lasted 34 minutes. The victim lost consciousness during the beating, and when he regained consciousness, he found that his gold bracelet, a ring, and $125 in cash were missing. By that time, police and paramedics were present on the scene. The victim denied drinking any alcohol that day.

¶ 31    On direct examination, the victim testified that he gave police a description of defendant, describing him as a 32-year-old "white Mexican," around 6'2" and 202 pounds. During cross-examination, defense counsel questioned the victim about his conversation with police, and the following testimony was elicited:

    "DEFENSE COUNSEL: [A]fter the beating took place, you spoke to the police, is
    that right?

    THE VICTIM: (No verbal response.)

    THE COURT:  Your answer was yes?

    THE VICTIM: Yeah. Yeah. *** No. No. No. It's not yes. I didn't know him.

    THE COURT:  He asked if you spoke with the police after ***.

    THE VICTIM: Oh, yeah, yeah. I never—I never talked to him like go bye, no.

    DEFENSE COUNSEL: Okay. But when you're speaking about the defendant,
    right?

11

THE VICTIM: Yeah.

DEFENSE COUNSEL: But you spoke to the police?

THE VICTIM: After.

DEFENSE COUNSEL: *** After the beating and the police came, you talked to the police, is that right?

THE VICTIM: No, I didn't talk to the police.

DEFENSE COUNSEL: Didn't you give the police a description like the State's Attorney asked you?

THE VICTIM: Oh, yeah, because if Martin find out that these guys break wrist, Martin come, come, he said these guys—[unintelligible].

DEFENSE COUNSEL: Okay. After you were beaten, you spoke to the police, correct? Is that right?

THE VICTIM: No.

DEFENSE COUNSEL: When did you speak to the police?

THE VICTIM: When I find out they they—Martin tell me they—

DEFENSE COUNSEL: Okay. I'm asking did you give a description to the police of the men who did this to you?

THE VICTIM: A friend of mine.

DEFENSE COUNSEL: You gave—well, didn't you give a description to the police like when the State's Attorney asked you, you said six-two, right, the person was six-two, about six-two?

THE VICTIM: No, I say that.

DEFENSE COUNSEL: Right. You told the police the person was six-two?

12

THE VICTIM: Yeah, because I remember, I remember when he hit me.

DEFENSE COUNSEL: You also told the police that the person who did that was between 18 and 20 years old, right?

THE VICTIM: 18 and 20—no, not way. I say 199.

DEFENSE COUNSEL: The weight?

THE VICTIM: 202.

DEFENSE COUNSEL: But you also told them that the person was between the age of 18 and 20 years old, right?

THE VICTIM: No.

DEFENSE COUNSEL: You didn't tell them that?

THE VICTIM: No. No.

DEFENSE COUNSEL: How many people did you tell the police were involved in the beating?

THE VICTIM: I say four and then four.

DEFENSE COUNSEL: Okay. You told them four?

THE VICTIM: And then two beating me. This one set me up. He set me up, pushed me then they started.

DEFENSE COUNSEL: *** [W]hen you spoke to the police and you told the police that the person was *** six-foot-two and 200- something pounds, 202 pounds, did you tell them that you knew the person from Miska's bar?

THE VICTIM: No. No.

DEFENSE COUNSEL: Did you ever tell the police that you had seen the person before?

13

THE VICTIM: No.

DEFENSE COUNSEL: Never told them that, did you?

THE VICTIM: No.

DEFENSE COUNSEL: You told them that you didn't know who the person was, right?

THE VICTIM: No, because I never talked to the police, never.

DEFENSE COUNSEL: You never talked to the police?

THE VICTIM: No.

DEFENSE COUNSEL: Who did you tell, when you said that you told somebody that the defendant was six-two, who did you tell that to?

THE VICTIM: I tell one day the police, he stopped me.

THE COURT: Say that again.

***

THE VICTIM: He stopped me.

THE COURT: They stopped you?

THE VICTIM: He stopped me and I tell them. They say what they—they say what they do. What did they do, and I say, I'm just—I'm was just like looking around to see if myself, see who I tell in case he stopped me why, why myself is because they robbed me."

¶ 32    Defense counsel then attempted to question the victim about defendant's role in the beating and how long he remained at the scene. The following exchange occurred:

"Q. Now you say the actual beating happened about 34 minutes?

A. Yes.

14

Q. And how long was [defendant] there or the defendant, how long do you say that the person was there for before they ran away?

A. Oh, no. No, they didn't. They didn't run away. He didn't run away.

Q. He never ran away?

A. No, he was like I saw him. I was walking, and I think—I'm not sure if there is one more, one more, or one—I think it's one more, and I saw him and I didn't talk to nobody, but I saw him.

Q. The person that pushed you to the ground, did you ever see them run away from where you were?

A. Oh, yeah.

Q. How long was it, because the beating took place for 34 minutes, how long did that person stay, stay there before they ran away?

A. The day I got beaten?

Q. Yes.

A. No, he didn't run away the same day, the same day.

Q. The person who pushed you to the ground did not hit you with a two-by-four, it was somebody else?

A. No, he hit me with the four-by-four. There was four, four take turns.

Q. But the person who pushed you to the ground, he wasn't the person who hit you with the four-by-four, is that correct?

A. Yeah, that's correct.

Q. And the person who pushed you to the ground didn't beat you when you were on the ground, is that right?

15

A. No, he hit me. He hit me. That's him. (Indicating.) That's him. He's the one. He hit me once, throw me down, and then they took—and then they took chances.

Q. But somebody else came and hit you with the four-by-four?

A. Four, they took chances, the four. The four hit me. You want me confused.

Q. No, I don't want—I don't want you to be confused. I just want to know how long you had seen that person before they ran away because the beating you say took place for 34 minutes, longer than a half hour?

A. Yeah.

Q. How long was that person there? The person you identify as the defendant, how long were they there during that 34 minutes?

A. Like four months.

Q. No, no, no, I'm not talking about months. I'm talking about minutes when the beating happened. How long was it that you saw the defendant standing there for the beating? How many minutes was there before—how many minutes was he there for the beating?

A. After the beating?

Q. During the beating, how long was he there for?

A. Oh, like 14 minutes.

Q. 14 minutes?

A. Yes."

¶ 33    In closing, the State argued, among other things, that "[o]ne witness is enough" to convict defendant of the offense but that in this case "three different people" had "identified the defendant as being involved in these crimes." The State argued that the victim had a good opportunity to

16

view defendant, that his descriptions of the offender were consistent with defendant, and that he immediately and without hesitation identified defendant in the lineup and in the video deposition. The State then asked "How else do you know the defendant is the right guy? *** [B]oth Alvaro Rodriguez and Caroline Ocasio identified defendant *** as Polaco, and *** identified the defendant to police as the person who tried to sell them a gold bracelet on or about the day of the beating." The prosecutor argued that defendant "has such audacity that he takes the victim's stolen property and actually goes back into the crime scene where this all started and tries to sell his jewelry at Miska's Liquors. *** [H]e had that bracelet. He had th[e] proceeds that he tried to sell at the store."

¶ 34 The jury returned a verdict finding defendant not guilty of attempted first degree murder and guilty of armed robbery and aggravated battery. The trial court sentenced him to concurrent respective terms of 12 and 5 years' imprisonment.

¶ 35 On direct appeal defendant was represented by the same attorney who represented him at trial. Defendant argued, among other things, that the evidence was insufficient to support his convictions and that the trial court erred in admitting the victim's videotaped deposition where the defense had not been able to finish its cross-examination. Defendant also contended that the court erred in admitting Rodriguez's prior testimony as an unavailable witness.

¶ 36 Another panel of this court affirmed, finding that the evidence was sufficient to sustain defendant's convictions and agreeing with the trial court's assessment that defense counsel had the opportunity to conduct substantial cross-examination before the victim became ill. *People v. Myers*, 2019 IL App (1st) 151750-U. This court further noted that, because defendant did not contest the admission of the victim's largely consistent testimony from the Luna trial, any error in

17

admitting the video deposition would be harmless. *Id.* ¶ 34. This court also found no error in the trial court's finding that Rodriguez was unavailable. *Id.* ¶ 45.

¶ 37    Thereafter, on December 10, 2019, defendant filed a *pro se* petition for postconviction relief. In that petition, defendant argued, among other things, that he was denied the effective assistance of counsel where counsel "failed to conduct basic investigations, file pretrial motions to exclude witnesses, [and] failed to raise meritorious issues on direct appeal." Specifically, defendant alleged that counsel was ineffective for "failing to contact Caroline Ocasio and Alvaro Rodriguez," for "fail[ing] to procure and investigate the statement" that "defendant allegedly attempted to sell a gold bracelet to them in [S]eptember," and for failing to "file a pretrial motion to exclude them." Defendant further stated that it was "prosecutorial misconduct" for the prosecutor to state during closing arguments that defendant "had the victim's stolen property on him either later that day or the next day when he tried to sell [the victim]'s bracelet to the employees at Miska's Liquors" and that counsel's "failure to object to these unsupported statements during closing arguments rendered him ineffective."

¶ 38    On March 6, 2020, the trial court entered a written order dismissing defendant's petition for postconviction relief and finding it to be frivolous and patently without merit. Specifically, the trial court stated that conflicting statements from Ocasio and Rodriguez were not grounds to exclude them as witnesses and that, "even though they did not witness the robbery, the evidence that [defendant] tried to sell them a gold bracelet was undoubtedly relevant to establish that [defendant] stole [the victim]'s bracelet." As to defendant's argument that the prosecutor improperly argued in closing that he tried to sell the victim's stolen property, the trial court stated that "the evidence established that the victim was missing a gold bracelet after the assault, and

18

Ocasio and Rodriguez's prior statements to police indicated that [defendant] offered to sell them a gold bracelet after the assault."

¶ 39 In this court, defendant argues that the trial court erred in dismissing his postconviction petition because it raised an arguable claim of ineffective assistance of counsel. Specifically, defendant contends that trial counsel was ineffective for failing to prevent the introduction of prior statements from Ocasio and Rodriguez that defendant tried to sell them a gold bracelet and for failing to object to the State's use of those out-of-court statements as substantive evidence of defendant's guilt, including in comments during closing argument. Defendant also asserts that counsel was ineffective for failing to prevent the State from introducing portions of the victim's video deposition showing him having what appeared to be a heart attack.

¶ 40 The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2020)) allows a defendant to challenge a conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). An action for postconviction relief is a collateral proceeding rather than an appeal from the underlying judgment. *People v. Williams*, 186 Ill. 2d 55, 62 (1999). Principles of *res judicata* and waiver will limit the range of issues available to a postconviction petitioner " 'to constitutional matters which have not been, and could not have been, previously adjudicated.' " *People v. Scott*, 194 Ill. 2d 268, 273-74 (2000) (quoting *People v. Winsett*, 153 Ill. 2d 335, 346 (1992)). Accordingly, rulings on issues that were previously raised at trial or on direct appeal are *res judicata*, and issues that could have been raised in the earlier proceedings, but were not, ordinarily will be deemed waived. *Id.* at 274; 725 ILCS 5/122-3 (West 2020). Although claims of ineffective assistance of trial counsel based on matters appearing in the record would ordinarily be forfeited where they could have been raised on direct appeal where, as here, trial counsel continues to represent a defendant on direct appeal, "notions of waiver will yield

19

to considerations of fundamental fairness," and a defendant is permitted to challenge trial counsel's effectiveness in postconviction proceedings. *People v. Lawton*, 212 Ill. 2d 285, 296 (2004).

¶ 41 Once a petitioner files a petition under the Act, the trial court must first, independently and without considering any argument by the State, decide whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2020). A postconviction petition is frivolous or patently without merit only if it "has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009); see also 725 ILCS 5/122-2.1(a)(2) (West 2020). A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. We review the summary dismissal of a postconviction petition *de novo. People v. Simms*, 192 Ill. 2d 348, 360 (2000).

¶ 42 To survive dismissal at this initial stage, the postconviction petition "need only present the gist of a constitutional claim," which is a low threshold that requires the petition to contain only a limited amount of detail. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). Additionally, a petition need not make legal arguments or cite legal authority. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). All well-pleaded facts must be taken as true unless "positively rebutted" by the trial record. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). The trial court may not engage in any fact-finding or credibility determinations at the pleading stage of postconviction proceedings. *Id.* Our supreme court has instructed that *pro se* postconviction petitions should be viewed "with a lenient eye, allowing borderline cases to proceed to stage two." *People v. Carballido*, 2011 IL App (2d) 090340, ¶ 38.

¶ 43 In this appeal, defendant raises claims of ineffective assistance of counsel. Both the federal and state constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; see also *People v. Hartfield*,

20

2022 IL App (1st) 200719, ¶ 16. Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id.* at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Applied to a first-stage postconviction petition, "a petition alleging ineffective assistance may *not* be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced." (Emphases added.) *Hodges*, 234 Ill. 2d at 17.

¶ 44    Before reaching the merits of defendant's appeal, we first address the State's argument that defendant has forfeited his claims because his present arguments are "distinct from the claims in his petition" and that appellate counsel's "reshaping [of defendant's *pro se* claims] goes beyond the liberal construction doctrine."

¶ 45    It is well established that "claims not raised in a petition cannot be argued for the first time on appeal." *People v. Jones*, 213 Ill. 2d 498, 505-06 (2004). However, as stated above, our supreme court expressed concern that *pro se* petitions should be given a liberal construction and should be reviewed " 'with a lenient eye, allowing borderline cases to proceed.' " *Hodges*, 234 Ill. 2d at 21 (quoting *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983)). "While in a given case the *pro se* defendant may be aware of all the facts pertaining to his claim, he will, in all likelihood, be

21

unaware of the precise legal basis for his claim or all the legal elements of that claim." *People v. Edwards*, 197 Ill. 2d 239, 245 (2001). It is for this reason that a *pro se* defendant is required to present only the "gist" of a constitutional claim, which is "something less than a completely pled or fully stated claim." *Id.* The question on appeal from the dismissal of a postconviction petition is whether the allegations in the petition, when liberally construed and taken as true, are sufficient to invoke relief under the Act. *Id.*

¶ 46    The State contends that the allegations of defendant's *pro se* petition raised a claim that counsel was ineffective for failing to "exclude" Ocasio and Rodriguez's testimonies altogether, whereas defendant's arguments in this appeal are "focuse[d] on excluding portions of Detective Pulcanio's testimony" based on the testimonies of Ocasio and Rodriguez "and a technicality of different exceptions to the hearsay rule." A liberal construction of the claims in the *pro se* petition, however, reveals that defendant adequately alleged a claim of ineffective assistance based on counsel's failure to move to exclude evidence that defendant attempted to sell a bracelet to Ocasio and Rodriguez as substantive evidence of his guilt of the charged offense.

¶ 47    In defendant's *pro se* petition, he contended that counsel should have filed a motion to exclude the testimony of Ocasio and Rodriguez and that there was "a reasonable probability that a timely pretrial motion would have been granted," where "they were not eyewitnesses to the robbery, and they later stated that they could not recall defendant coming into the liquor store to sell a bracelet." Defendant further asserted that counsel allowing the testimony to come in "open[ed] the door for Detective Pulcanio to further incriminate defendant by stating that both these witnesses told him that defendant attempted to sell them a bracelet and they feared retaliation if they were to testify against him." Defendant additionally claimed that counsel was ineffective for failing to object to the prosecutor's statements during closing argument that defendant

22

possessed stolen property and that he tried to sell the victim's bracelet. Defendant asked, "How can the State say these things about these witnesses when they failed to testify to these facts during trial[?]"

¶ 48　A liberal construction of the above contentions shows that defendant's ineffective assistance claim was adequately raised in his *pro se* petition, and we now turn to whether that claim raised the gist of ineffective assistance of counsel.

¶ 49　Defendant contends that his petition makes nonfrivolous claims of ineffective assistance based on trial counsel's failure to object to the State introducing prior inconsistent out-of-court statements of Ocasio and Rodriguez through Detective Pulcanio that defendant, who they knew as "Polaco," tried to sell them a gold bracelet.

¶ 50　Underlying defendant's arguments is his contention that the prior statements of Ocasio and Rodriguez amounted to inadmissible hearsay, which should neither have been introduced through Detective Pulcanio's testimony nor relied on by the State in closing argument. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *People v. Lawler*, 142 Ill. 2d 548, 557 (1991). In general, the rule against hearsay evidence prohibits a party from introducing a witness's out-of-court statement during trial. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *People v. Simpson*, 2015 IL 116512, ¶ 27.

¶ 51　Normally, " 'what matters to object to and when to object' are matters of trial strategy." *People v. Perry*, 224 Ill. 2d 312, 344 (2007) (quoting *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997)). However, defense counsel has an " 'overarching duty' " to advocate for his or her client and use his or her skills and knowledge to ensure that the trial afforded to the defendant is a reliable, adversarial one. *People v. Watson*, 2012 IL App (2d) 091328, ¶ 22 (quoting *Strickland*, 466 U.S.

23

at 688). Counsel is "expected to use established rules of evidence and procedure to avoid, when possible[,] the admission of incriminating statements, harmful opinions, and prejudicial facts." (Internal quotation marks omitted.) *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 32 (citing *People v. King*, 316 Ill. App. 3d 901, 916 (2000), citing *People v. Moore*, 279 Ill. App. 3d 152, 159 (1996)). In other words, the constitutional guarantee of effective assistance of counsel assumes that counsel, in fulfilling his or her duty, will "engage evidentiary rules to shield [the defendant] from a decision based on unreliable evidence," "will appreciate and understand the legal principles applicable to the case" at hand, and will provide assistance ready to ensure " 'an adversarial check to a prosecutor's excessive endeavors.' " *Watson*, 2012 IL App (2d) 091328, ¶ 22 (quoting *People v. Fletcher*, 335 Ill. App. 3d 447, 453 (2002)).

¶ 52    Defendant asserts, and the State does not contest, that the prior out-of-court statements of Ocasio and Rodriguez were not admissible substantively as evidence of a prior inconsistent statement under section 115-10.1 of the Criminal Code (Code) (725 ILCS 5/115-10.1 (West 2014)). We agree.

¶ 53    Section 115-10.1 of the Code allows a party to introduce a witness's prior statement as substantive evidence during a criminal trial if

> "(a) the statement is inconsistent with his testimony at the hearing or trial, and
>
> (b) the witness is subject to cross-examination concerning the statement, and
>
> (c) the statement—
>
> > (1) was made under oath at a trial, hearing, or other proceeding, or
> >
> > (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

24

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." *Id.*

¶ 54    In this case, the witnesses' alleged prior statements were made to Detective Pulcanio and not under oath at a trial, hearing, or other proceeding. Detective Pulcanio did not electronically record his conversations with Ocasio and Rodriguez, nor did the witnesses write or sign a statement that a defendant tried to sell them a gold bracelet. Accordingly, the witnesses' statements would be admissible as substantive evidence under section 115-10.1 only if the witnesses acknowledged making the out-of-court statements under oath. See *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 72 ("[B]ecause the detectives neither had [the witness] write or sign a statement nor electronically recorded their conversation, the State was precluded from introducing [the witness's] prior statement when he failed to acknowledge he made the specific statements attributed to him."); *People v. Lewis*, 2017 IL App (4th) 150124, ¶ 31 (finding prior inconsistent statement could not be introduced as substantive evidence under section 115-10.1 because it was not written, signed, or recorded by electronic means). However, neither witness acknowledged telling Detective Pulcanio that defendant tried to sell them a gold bracelet, and accordingly, such statements were not admissible substantively under section 115-10.1.

¶ 55    Defendant also contends, and the State also does not contest, that the witnesses' prior statements were not admissible as impeachment evidence. Again, we agree.

¶ 56    Prior inconsistent statements, where not otherwise admissible as substantive evidence, are sometimes admissible to undermine the credibility of a witness. *Lewis*, 2017 IL App (4th) 150124, ¶ 35 ("When a witness is impeached with statements made by him out of court, those statements may not be considered for their truth—that is, they do not constitute substantive evidence. The fact that the witness made different, contradictory statements should be used *only* to undermine the credibility of the witness." (Emphasis in original.)). However, our supreme court has "repeatedly disapproved prosecutorial efforts to impart substantive character to prior inconsistent statements under the guise of impeachment," recognizing that "jurors may find it difficult to consider prior inconsistent statements solely to determine credibility and may afford such testimony substantive value." (Internal quotation marks omitted.) *People v. Cruz*, 162 Ill. 2d 314, 364 (1994).

¶ 57    Consequently, a party may impeach its own witness only if it can first establish that the witness's testimony "[a]ffirmative[ly] damage[d]" the party's case. *Id.* at 359-60; *People v. McCarter*, 385 Ill. App. 3d 919, 933 (2008) ("the purpose of impeachment is to cancel out damaging testimony by a witness; if no such damaging testimony has been proffered, then the only purpose of introducing a prior inconsistent statement is to get it before the jury as substantive evidence").

¶ 58    For a witness's testimony to be affirmatively damaging, "it must do more than fail to support the State's position; it must give 'positive aid' to the defendant's case, for instance, by being inconsistent with the defendant's guilt under the State's theory of the case." *McCarter*, 385 Ill. App. 3d at 933 (quoting *Cruz*, 162 Ill. 2d at 362). "It is insufficient that a witness merely disappoints the State by failing to incriminate the defendant" (*McCarter*, 385 Ill. App. 3d at 933

26

(citing *Cruz*, 162 Ill. 2d at 362)), and testimony is not affirmatively damaging if the State is "no worse off than had [the witness] not taken the stand at all" (*Cruz*, 162 Ill. 2d at 362-63).

¶ 59 Here, Ocasio and Rodriguez's testimony in which they did not admit to telling Detective Pulcanio that defendant tried to sell them a gold bracelet did not affirmatively damage the State's case. Although the State may have been disappointed by their failure to testify consistently with their prior statements, that disappointment did not allow the witnesses' prior statements to be introduced as impeachment evidence. *McCarter*, 385 Ill. App. 3d at 933; *Cruz*, 162 Ill. 2d at 362-63.

¶ 60 Moreover, even if Ocasio's and Rodriguez's statements were admissible as impeachment evidence, such evidence could have only been used to undermine the witnesses' credibility, as explained above. Yet here, the witnesses' prior statements were clearly and repeatedly used as substantive evidence of defendant's guilt. In closing, the prosecutor relied heavily on the out-of-court statements of Ocasio and Rodriguez as substantive evidence of defendant's guilt. The prosecutor argued to the jury that the evidence showed that defendant possessed the victim's stolen property, that he tried to sell that bracelet to Ocasio and Rodriguez, and that there were not one but three witnesses who demonstrated that defendant was involved in the offense.

¶ 61 Presumably acknowledging that the statements were inadmissible as a prior inconsistent statement or as impeachment, the State contends that the witnesses' prior statements identifying defendant as "Polaco" and stating that he tried to sell them a gold bracelet were instead admissible substantively under section 115-12 as a statement of identification. See 725 ILCS 5/115-12 (West 2014).

¶ 62 Section 115-12 is a statutory exception to the hearsay rule, which allows for the admissibility of prior identification evidence. *People v. Lewis*, 165 Ill. 2d 305, 342-43 (1995). The

purpose of the statute is to permit the use of prior out-of-court statements "as corroborative or substantive evidence of a witness' prior identi[fication] of a defendant." *Id.* at 343. The statute provides that a "statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2014).

¶ 63 Our supreme court has defined "statements of identification" broadly to encompass "the entire identification process." *People v. Tisdel*, 201 Ill. 2d 210, 219 (2002) (trial court properly permitted evidence of witnesses' nonidentification of perpetrator in prior lineups composed of individuals with features similar to defendant's). However, section 115-12 does "not allow the admission of every discussion between a [witness] and a police officer, only those pertaining to identification of a person made after perceiving him." *People v. Newbill*, 374 Ill. App. 3d 847, 853 (2007).

¶ 64 Initially, we note that a careful reading of the record indicates that the State did not actually elicit any testimony from Detective Pulcanio that Ocasio and Rodriguez identified defendant as the man who attempted to sell them a gold bracelet. Instead, Detective Pulcanio testified that the witnesses identified the photograph of defendant as a person who they knew by the nickname of "Polaco." Then, it was Detective Pulcanio who testified that Polaco was "the same person" who the witnesses "told [Detective Pulcanio] came into the store and tried to sell the gold bracelet."

¶ 65 Nevertheless, even if we could find that there was evidence that the witnesses actually identified defendant as having attempted to sell a gold bracelet, we do not find their out-of-court statements here to have been properly admitted under the identification exception.

¶ 66    The State relies on *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 42, which provides that, "when admitting a prior identification as substantive evidence under section 115-12, the testimony may include a description of the offense only to the extent necessary to make the identification understandable to the jury, but it may not go beyond that to provide detailed accounts of the actual crime." (Internal quotation marks omitted.) The State contends that the alleged identifications of defendant as the man who tried to sell the witnesses a gold bracelet "made the identifications intelligible to the jury and did not include *any* details of the actual robbery and beating of [the victim]." The State's argument illustrates the inapplicability of the prior identification exception here.

¶ 67    As the appellate court in *People v. Neal*, 2020 IL App (2d) 170356, ¶ 34, explained, the purpose of section 115-12 is "mostly focused on the admissibility of identification statements made by victims or eyewitnesses shortly after the offense." Although the *Neal* court determined that the statute was not strictly limited to identifications from victims and eyewitnesses—in that case, the identification at issue was made by the defendant's stepfather upon viewing still photographs from surveillance footage of the defendant committing the crime—the identification still needs to bear some relation to the offense charged.

¶ 68    The out-of-court statements admitted here are far different than the ones introduced in other cases, as the statements here did not identify defendant as having committed the beating and armed robbery that was at issue. The State cites no authority, and we are aware of no authority, in which the identification exception has been used to admit an identification of a defendant that did not involve the offenses charged or the crime committed. For example, in *Anderson*, 2018 IL App (1st) 150931, ¶ 1, the defendant and two codefendants were charged with a shooting that resulted in the death of the victim. One witness testified that he saw the defendant provide the gun to another

29

codefendant who fired it. *Id.* ¶ 8. The witness also testified that he spoke to police three days after the offense and identified the defendant as the "person who was carrying a gun" and a codefendant as "the person who took the gun from [the defendant] and shot at the [vehicle containing the victim]." *Id.* ¶ 43. The State also introduced the witness's handwritten statements on the photo arrays. Next to defendant's photo, the witness had written, " 'I saw a gun in his waistband. The other guy took the gun from [the defendant] and shot at the [vehicle].' " *Id.* ¶ 36. Next to the codefendant's photo, the witness had written, " 'This is the person I saw get the gun from [the defendant] and shot [*sic*] at the [vehicle].' " *Id.* The photographs and handwritten statements were displayed for the jury during the witness's testimony and during closing arguments. *Id.*

¶ 69    On appeal, the defendant argued that State improperly bolstered the witness's credibility by introducing his prior consistent statements. The court explained that, "when admitting a prior identification as substantive evidence under section 115-12, the testimony may include a description of the offense only to the extent necessary to make the identification understandable to the jury, but it may not go beyond that to provide detailed accounts of the actual crime." (Internal quotation marks and omitted.) *Id.* ¶ 42. The court concluded that the witness's verbal testimony that he identified the defendant to police as the one who was carrying a gun and the codefendant as the one who took the gun from the defendant and fired was properly admitted as "the minimum detail necessary to make the identifications intelligible to the jury." *Id.* ¶ 43. The court, however, found that it was improper for the State to display the witness's handwritten statements on the photo arrays, as doing so served to unfairly emphasize those statements. *Id.* ¶ 48.

¶ 70    Unlike in *Anderson* and other cases involving the identification exception, the statements at issue here were not from witnesses to the crimes charged, and they did not identify defendant as having committed the charged offenses. Instead, the hearsay statements related to an incident

30

about which evidence would not otherwise be substantively admissible. Although the prosecution attempted to use the out-of-court statements as evidence that defendant possessed recently stolen property, the evidence was, at best, speculative and weak. While Ocasio and Rodriguez allegedly told Detective Pulcanio that defendant tried to sell them a gold bracelet, the bracelet was never recovered, and the witnesses did not describe the bracelet with any specificity from which it could be concluded that it was the bracelet taken from the victim. In particular, the evidence showed that the victim's bracelet had the Virgin Mary on it, but neither witness told the detective that the bracelet they saw bore any religious insignia. And neither witness specified when the alleged sale occurred, beyond providing a time period which the detective conceded could have been prior to the offense even occurring. However, despite the weakness in this evidence, the State significantly relied on the prior statements as substantive evidence that defendant possessed the victim's stolen bracelet and attempted to sell it. The State used the evidence to bolster what was essentially a single eyewitness case into a case in which, as the prosecutor argued in closing, "three different people have identified the defendant as being involved in these crimes." We find that this is not an appropriate use of the identification exception. See *Guerrero*, 2021 IL App (2d) 190364, ¶ 86 ("[I]n the circumstances present here, the admission of [the detective's] testimony as to [the witness's] identification of defendant permitted the State to bypass the requirements of section 115-10.1 and admit as substantive evidence [the witness's] prior statement to the police. That was error.").

¶ 71    Based on the above, we conclude that the hearsay statements of Ocasio and Rodriguez were inadmissible, and counsel was arguably deficient in failing to move to exclude them and in failing to object to the State's substantive use of those statements as evidence of defendant's guilt.

31

¶ 72    Having found that defendant adequately alleged that counsel was arguably deficient, we next turn to whether defendant adequately showed arguable prejudice. As set forth above, at the first stage of postconviction proceedings a petition alleging ineffective assistance is only required to show that "it is *arguable* that the defendant was prejudiced." (Emphasis added.) *Hodges*, 234 Ill. 2d at 17; *People v. Brown*, 236 Ill. 2d 175, 185 (2010). A petitioner need not show that the outcome certainly would have been different, but rather it need only be arguable that, had counsel performed adequately, a "significantly less than 50% chance exists of a different outcome." *People v. Hayes*, 2022 IL App (1st) 190881-B, ¶ 39 (citing *Hodges*, 234 Ill. 2d at 16; *Lucious*, 2016 IL App (1st) 141127, ¶ 45).

¶ 73    As explained above, the prosecutor relied heavily on the prior statements of Ocasio and Rodriguez to reinforce the victim's identification of defendant and argue that it was not only the victim who linked defendant to the offense. Had the prior statements of Ocasio and Rodriguez been excluded, the State's remaining evidence tying defendant to the offense was a single eyewitness, the victim, whose testimony was at times confusing and inconsistent and whose answers were often unresponsive to the question posed. In particular, the victim gave inconsistent testimony regarding how long the beating took place, how long defendant was at the scene, defendant's role in the offense, how many offenders were involved, and whether the victim spoke to the police.

¶ 74    While the victim's testimony was sufficient to support a finding of guilt, the evidence against defendant was far from overwhelming, particularly where the only other testifying eyewitness to the offense, Hernandez, testified that she did not see defendant at the scene. Accordingly, we find it arguable that, without the improper evidence and argument, the outcome of defendant's trial would have been different. See *People v. Piatkowski*, 225 Ill. 2d 551, 567-68

32

(2007) (evidence was closely balanced where no physical evidence or confession connected the defendant to the offense and the State's case rested on two eyewitnesses); *People v. Jura*, 352 Ill. App. 3d 1080, 1093 (2004) ("defendant was prejudiced by defense counsel's deficient performance, which allowed *** the jury to consider improper hearsay testimony repeatedly; and *** the State in opening statement and closing argument to rely on the improper hearsay as substantive proof of defendant's guilt").

¶ 75    For the foregoing reasons, we find that defendant's petition has met the low threshold required to allege a claim of ineffective assistance of counsel at the first stage, based on counsel's failure to move to exclude the out-of-court statements of Ocasio and Rodriguez and counsel's failure to object to the State's use of those statements as substantive evidence of defendant's guilt. Accordingly, we need not address defendant's remaining claim of ineffectiveness based on counsel's failure to move to exclude the portions of the videotaped deposition showing the victim having a medical emergency, since the Act does not permit piecemeal dismissal of individual claims at this stage. See *People v. Cathey*, 2012 IL 111746, ¶ 34; *People v. Rivera*, 198 Ill. 2d 364, 374 (2001). Instead, under the Act, the court must "docket the *entire* petition, appoint counsel, if the petitioner is so entitled, and continue the matter for further proceedings in accordance with sections 122-4 through 122-6." (Emphasis in original.) *Rivera*, 198 Ill. 2d at 371.

¶ 76    As set forth above, we reverse the summary dismissal of defendant's postconviction petition and remand for second-stage proceedings.

¶ 77    Reversed and remanded.

33

*People v. Myers*, 2023 IL App (1st) 210642

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-321; the Hon. Domenica A. Stephenson, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Eric E. Castañeda, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Tasha-Marie Kelly, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |