2025 IL App (1st) 230044-U

SECOND DIVISION
July 29, 2025

No. 1-23-0044

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 89CR23714 |
| | ) | |
| PETER SAUNDERS, | ) | Honorable |
| | ) | Joanne F. Rosado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   No error occurred in the second stage dismissal of defendant's postconviction petition where defendant received reasonable assistance from his appointed postconviction attorneys.

¶ 2    Defendant Peter Saunders appeals the trial court's second stage dismissal of his successive postconviction petition, arguing that his postconviction lawyers provided unreasonable assistance under Illinois Supreme Court Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. July 1, 2017)). Specifically, defendant contends that his postconviction attorneys pursued a frivolous sentencing claim under the eighth amendment (U.S. Const., amend. VIII) while failing to provide support for his

potentially meritorious claim under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) based on offenses committed when he was 16 years old.

¶ 3     Following a bench trial, defendant was found guilty of first degree murder, home invasion, armed robbery, and attempted rape arising from the June 1983 death of Elisa Totoni. The trial court subsequently sentenced defendant to a term of natural life for the first degree murder conviction and an aggregate consecutive term of 75 years on the remaining convictions.

¶ 4     We summarize the evidence presented at defendant's jury trial as necessary for resolution of the issue raised on appeal. The record on appeal indicates that the report of proceedings from defendant's trial was damaged in a flood and unable to be fully reconstructed. Our discussion of the trial is taken from defendant's direct appeal. A full recitation of the evidence presented at defendant's trial is set forth in that opinion. *People v. Saunders*, 235 Ill. App. 3d 661 (1992). The transcript from defendant's sentencing hearing from December 1989 was able to be reproduced and is included in the record on appeal.

¶ 5     On June 22, 1983, Joanne Totoni went to her mother's apartment after she could not reach her mother on the telephone. When she entered the apartment, Joanne "noticed the apartment was in a mess and also saw her mother covered with blood lying on the floor of the bedroom." *Id*. at 664. During the police investigation, fingerprints from the scene were recovered and preserved. A police officer and latent fingerprint examiner submitted the fingerprints to the Automated Fingerprint Identification System (AFIS). Around November 1986, upon receiving a list of potential matches from AFIS, the officer obtained defendant's fingerprint card and determined that defendant's fingerprints matched those taken from Totoni's apartment. Police located defendant's mother and learned defendant was in California. After he was taken into custody, defendant

provided multiple incriminating statements to police, including a court-reported statement to an assistant State's Attorney (ASA), which was admitted at trial. *Id*. at 664-65.

¶ 6       According to his statement, defendant stopped at an apartment building while on his way to school. He knocked on several doors in the building, including Totoni's door. When she answered, he asked her to sponsor him in a walk-a-thon. She invited him in and questioned him about the program. When defendant suggested she donate $5, Totoni became upset, told defendant he did not have to tell her the amount to give, and asked the defendant to leave. Defendant became upset, refused to leave the apartment, and a struggle ensued. *Id*. at 665.

¶ 7       Defendant pushed Totoni, she swung at defendant in response, and he then struck her with his fists, causing her to fall. Totoni continued to fight, picked up a ceramic cup, and hit defendant on the shoulder. Defendant took the cup from Totoni and began to hit her across the head. Totoni scratched defendant and he then bit her. Totoni then ran to the bathroom and defendant followed. When defendant pushed open the door, Totoni picked up an iron and swung it at the defendant but he grabbed the iron from her and repeatedly hit her with it about the head and face until she fell on the floor. Defendant then stabbed Totoni in the neck with a knife. Afterwards, defendant searched the apartment for money, taking $700 and a bottle of Jack Daniels alcohol. He later burned his blood-stained shirt and pants in the incinerator. The next day, he purchased a car with the money. *Id*. at 665-66. Defendant also admitted in his statement that he attempted to have sexual intercourse with Totoni and the autopsy showed the physical evidence of injury to Totoni's vaginal area. *Id*. at 672. The parties stipulated to the medical examiner's findings that Totoni died on June 22, 1983, and her cause of death was "stab wounds to the neck, and cutting wounds and blunt trauma to the head and face, causing a skull fracture and hemorrhaging." *Id*. at 666.

¶ 8    At defendant's December 1989 sentencing hearing, the State presented the testimony of several witnesses in aggravation. Sergeant Anthony Russelle was employed in the youth division of the Chicago Police Department in April 1983. At around noon on April 8, 1983, he and his partner were patrolling Lane Tech High School in Chicago when he saw a person in the parking lot and identified him in court as defendant. Defendant told Sergeant Russelle he was a student at Lane Tech and was at lunch. Sergeant Russelle said the officers were going to bring defendant back to school and check if he was truant. During a pat-down, Sergeant Russelle found a 3.5-to-4-inch, straight edge razor in defendant's pocket. The sergeant then placed defendant under arrest for unlawful use of a weapon. Defendant said that he needed the razor for his protection because he lived in a bad area.

¶ 9    In October 1983, Lynn Cooper was working as a property manager for Edgewater Redevelopment, located at 6300 North Kenmore in Chicago. At approximately 11 a.m. on October 12, 1983, she was in the office with a painter when a man entered the office and asked to view an apartment. She identified defendant in court as that man. She then showed defendant three or four apartments. At the end, he asked to return to a studio he liked, and she took him to that unit. While inside the apartment, Cooper turned to leave when defendant jumped on her back. He "grabbed" her from behind, put his hand over her mouth, put a knife to her neck, and told her not to move or scream. Defendant then started to stab Cooper's neck. She then moved to get away from him and he "kept swinging" at her with knife. She continued to struggle to keep defendant away from her. Her hand was cut, and he also cut her around her chest and neck. She was able to get the knife during the fight. Defendant then took the knife back and ran down the street. Cooper called for the painter. She told him what happened, and the painter ran after defendant and caught him. Cooper was taken to the hospital to get stitches. She described the knife as "like a double edge combat

dagger." While at the hospital, Chicago police brought an individual for her to view, and she identified defendant as her attacker.

¶ 10    Officer Patrick Garrity testified that on October 12, 1983, he was dispatched to a disturbance call at 6300 North Kenmore Avenue. Officer Garrity spoke to Cooper, who gave a description of defendant and told him that the offender was being chased southbound on Kenmore Avenue. The officer was directed to the platform at the Granville El station by people in the area. When he arrived on the platform, defendant was being held by the painter. Officer Garrity placed defendant under arrest and recovered a knife from him. He then took defendant to the hospital for Cooper to make an identification.

¶ 11    Later that day, Detective James Spencer interviewed defendant at the police station. Defendant said he went to look at an apartment on Kenmore Street and after viewing three apartments, he grabbed the woman showing the units. He cut her in the neck with a knife. She started to struggle and then he fled to the Chicago Transit Authority (CTA) station.

¶ 12    Warren Watkins was employed as a field probation officer and was assigned defendant's case related to the Kenmore assault in October 1983. Defendant was charged with two counts of aggravated battery, one count of unlawful possession of a hypodermic needle, and one count of unlawful use of a weapon in the juvenile court. As part of his investigation, Watkins reviewed any prior involvement by defendant with the Chicago police. He learned that defendant had two "station adjustments" from February 1981 for attempted rape and aggravated battery and from April 1981 for unlawful use of a weapon and possession of a razor. Watkins explained that a "station adjustment" occurs when during the course of an investigation by a youth officer, a decision is made not to refer the case to the juvenile court. The matter is documented by the police and "as long as all of the parties agree," the youth officer could determine that a "particular

5

diversion" within his or her discretion was appropriate in the case.

¶ 13　After reviewing the police report and speaking with defendant's mother, Watkins learned that the February 1981 station adjustment arose when defendant was going door to door in the apartment building where he resided with his mother trying to sell items. Defendant "gained access to the apartment of an 84-year-old woman," handcuffed her to a chair and "the charges indicated attempted rape." Defendant's mother told Watkins "all he had done was fondle the woman." Defendant's mother told Watkins that she spoke with the victim that "if she agreed to the station adjustment," defendant "would go into psychiatric treatment right away" and "the victim agreed with the youth officer's utilization of the dispositional alternative of station adjustment." Defendant's mother also told Watkins that she had moved from where defendant attacked the 84-year-old after defendant was found again walking the halls of the apartment building attempting to sell things. The building management told her residents were concerned and that she would have to move.

¶ 14　Regarding the case in which Cooper was attacked, Watkins was present in the juvenile courtroom when defendant admitted to aggravated battery and unlawful use of a weapon and was committed to the Illinois Department of Corrections Youth Division.

¶ 15　Detective John Gibson of the Los Angeles Police Department was assigned to investigate a fatal car accident in May 1986, in which the passenger was killed and the driver had been taken to the hospital. When he went to the scene, the vehicle was leaning against a power pole. Defendant was identified in court as the driver and was interviewed by Gibson at the hospital. Defendant admitted he took a car for a test drive from a dealership with the intention to keep the car. When stopped by police, defendant fled because he was afraid that he would be arrested for a parole violation in Illinois. According to witnesses, defendant was driving 65 to 70 miles an hour at the

time of the crash in an area with a speed limit of 15 miles per hour. Gibson observed a handgun in the car at the accident scene. During the interview, defendant admitted that he had taken the handgun in a burglary. He also admitted that he had committed several burglaries in Los Angeles.

¶ 16    Courtney Thomas testified that she was an investigating probation officer for Los Angeles County and prepared a postsentence report for defendant's case in December 1986. In preparing the report, Thomas interviewed defendant, who told her that he had committed two criminal offenses as a juvenile. He indicated to Thomas that when he was sixteen years old, he was committing a residential burglary and got into a fight with two occupants that he encountered, and "[o]ne of them was stabbed twice and died." In the second incident, a woman was showing him an apartment and "[t]hey got into a fight and she was stabbed." He told Thomas that he received 18 months' imprisonment at a juvenile correctional facility in Illinois. While he was on parole, he left Illinois without permission and went to California in October 1985. Defendant admitted to Thomas that he had committed between 20 and 25 residential burglaries, and also "was hustling, living off of women, and selling drugs" to support himself in California.

¶ 17    Defendant described his drug use to Thomas, including that he started smoking marijuana at age 12 or 13, and later at approximately age 17, he began using cocaine and phencyclidine. He spent three months in a mental health facility when he was 13. He also said that he had been a member of the Imperial Gangsters street gang from ages 13 to 18.

¶ 18    When Thomas asked defendant about convictions in California, he told her he was convicted of involuntary manslaughter after he was stopped by police driving a stolen car, and as he was trying to flee, he hit a pole, and his friend, who was the front seat passenger, was killed. He also admitted that in the residential burglary conviction, he stole "stereo equipment, cameras, clothing, jewelry, and [] other items." When Thomas asked defendant if he had anything else to

say he said he did not, "[t]hat things always seemed to go wrong" and "[n]othing had ever changed." Thomas told the trial court that defendant did not express remorse for the person he stabbed and killed, the woman showing him the apartment who he stabbed, or for the death of his friend after he crashed the car fleeing the police. Defendant told Thomas that "he had difficulties since the break up of his parents' marriage when he was approximately ten years old."

¶ 19    The defense presented two witnesses in mitigation. Marvin Zimmerman, defendant's godfather, testified that he had known defendant since he was baby. He was close friends with defendant's adoptive parents. As a child, Zimmerman described defendant as "always very well behaved, very quiet, very considerate. Just very nice." At some point, defendant's parents "split" and defendant began to have troubles. Defendant lived with his mother but missed his father. Defendant would occasionally spend weekends with Zimmerman, including after the assault on Cooper. Zimmerman found defendant to behave the same as when he was younger, quiet, nice and considerate. Zimmerman was unable to describe defendant when he was around 10 to 13 years old because he saw defendant sporadically. Zimmerman lost contact with defendant for a while but had visited defendant in custody. He described defendant as the "same Peter I always knew. Warm, caring." Zimmerman had not seen defendant in three or four years until defendant was brought to Cook County Jail.

¶ 20    Lieutenant Daniel Robison was employed as a corrections officer at the county jail. He was familiar with defendant while in custody and described defendant as "a real good worker." Defendant worked in the gym by cleaning and putting out tools and other items, like dumbbells, for recreation. Defendant had not received any disciplinary writeups while in custody.

¶ 21    In his arguments, the prosecutor asked the court to sentence defendant to a term of natural life without the possibility of parole. He focused on the facts leading to Totoni's murder, as well

as all the other crimes defendant admitted to having committed both before and after Totoni's death. In describing the circumstances leading to Totoni's death, the prosecutor noted that Totoni was 65 years old, "a young 65," and "a healthy 65." Defendant came to her door using a scam and then she put up a fight when defendant turned violent. Defendant struck her numerous times with an iron, hit her "so hard with a frying pan that the frying pan bent over in half," and stabbed her in the neck with a knife. The prosecutor argued that defendant was intelligent and used that intelligence in a cunning way "like a fox." The prosecutor further contended that defendant had not expressed "one iota of remorse to anyone that he is sorry for any of his violent and vicious acts."

¶ 22   In response, defense counsel argued about the rehabilitative focus of the penitentiary system and that a person should not be jailed for life for a crime committed when he or she was 16. Counsel observed that the violent acts had occurred in 1983, but while in California, defendant's actions were not violent. Counsel also argued that defendant had been "pretty much a model prisoner." Counsel acknowledged that defendant had "possibly more materially than a lot of people who appeared before" the trial court, but defendant also had the "insecurity" of knowing he was adopted and the breakup of his adopted family. Counsel asked the court to "fashion a sentence here that allows [defendant] to look forward to some point in his life when he can get out and be a useful member of society." Counsel again argued that "if correction means anything at all, there should be some point in a 16 year old's life where you can say at that point he is not a danger. At that point he should be able to look forward to some part of his life to live as a free man."

¶ 23   Defendant spoke in allocution that he was "sorry for the misery that the Totoni family *** went through," and the pain and disappointments he had caused his family. Defendant stated that

9

he was "young at the time and things have changed" because he thought differently and his actions would be different.

¶ 24    The trial court began its findings by stating this was "one of the most senseless, brutal murders [he had] seen in [his] 30 years in the criminal justice system." The court found defendant's conduct to be "brutal, heinous and indicative of wanton cruelty." Noting that defendant would be eligible and an appropriate candidate for the death penalty but for his age, the court stated he was eligible for a sentence of natural life. The court then reasoned:

> "This Court specifically finds that based upon the nature and circumstances of the offense and the history and character of the Defendant, that a consecutive term is necessary to protect society. The People have presented evidence of a very dangerous individual indeed. About as dangerous a person as a person of his young age could possibly be. The Defendant has presented evidence suggesting, one, Defendant's problem may have been precipitated by the divorce of his father and mother. And secondly, that the Defendant's problem may have been further caused by his inability to be with his father during his young formative years after the separation. And thirdly, of the Defendant's good behavior while in custody. And it is a well known fact that there are some people who [are] absolutely marvelous when they are in custody. And I believe that the Defendant may be able to lead some useful life in society as long as he remains in custody. I have absolutely no doubt that the Defendant has brought great sadness into the lives of his family. But the Defendant has also brought death, destruction, and mayhem to his victims as well. A great emotional outrage and profound sorrow to the lives of his surviving victims and his deceased victim's family."

¶ 25    The trial judge then sentenced defendant to natural life without the possibility of parole for the first degree murder of Totoni, with consecutive terms of 30 years for armed robbery, 30 years for home invasion, and 15 years for the attempted rape. In closing, the court specifically stated, "For the purposes of any subsequent hearing by a pardon board or a governor, it is the articulated intention of this trial court that the [defendant] never, ever be released into society again."

¶ 26    On direct appeal, defendant argued that: (1) the trial court erred when it denied his motion to suppress statements made to the police in violation of his rights under the fifth and sixth amendments; (2) the trial court erred when it allowed a new indictment to supersede the original indictment because prosecution of all the offenses except murder, was barred by the period of limitations; (3) the evidence was not sufficient to prove him guilty beyond a reasonable doubt on the offenses of armed robbery and attempted rape; and (4) the trial court erred in imposing a sentence of natural life without parole plus a consecutive term of 75 years' imprisonment. *Saunders*, 235 Ill. App. 3d at 663-664. This court affirmed defendant's convictions and sentence. *Id*. at 664.

¶ 27    Defendant filed his initial *pro se* postconviction petition in May 2002, arguing that his sentence was unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The trial court dismissed the petition as untimely and that the issues raised were frivolous and patently without merit. This court affirmed the summary dismissal of defendant's petition. *People v. Saunders*, No. 1-02-2416 (2003) (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 28    In May 2018, defendant filed a motion seeking leave to file a *pro se* successive postconviction petition, arguing that his "rights under the Constitution of the United States and the State of Illinois were substantially denied." Specifically, he asserted that his eighth amendment rights were violated when the trial court sentenced him to natural life, plus 75 years, for a crime

he committed at 16, without a meaningful consideration of his youth and its attendant circumstances. The trial court granted defendant leave to file his successive petition and appointed the public defender to represent defendant.

¶ 29    In May 2019, defendant's initial postconviction counsel filed a certificate pursuant to Supreme Court Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. July 1, 2017)), stating that: (1) she had consulted with defendant by mail to ascertain his contentions of deprivations of his constitutional rights; (2) she had obtained and examined the Report of Proceedings of the trial; and (3) she had determined that the petition as it was written did not adequately represent defendant's constitutional claims and would be supplementing the petition. In the supplemental petition, counsel argued that defendant was entitled to be resentenced under the guidelines of *Miller v. Alabama*, 567 U.S. 460 (2012), because defendant "was just 16 years old at the time the crime for which he was convicted took place, his life sentence cannot stand."

¶ 30    In January 2021, the State moved to dismiss defendant's petition because defendant failed to make a substantial showing that his eighth amendment rights under *Miller* had been violated. More specifically, the Stated argued that while defendant could show cause to bring this claim because *Miller* set forth a new substantive rule that was previously unavailable, the record refuted defendant's claim that the sentencing court failed to consider his youth and its attendant characteristics.

¶ 31    In October 2021, the prosecutor informed the court that defendant's initial postconviction counsel had retired and a new postconviction counsel had been appointed. The successor counsel filed her Rule 651(c) certificate in March 2022, stating that: (1) she consulted with defendant by letter to ascertain his contentions of deprivations of constitutional rights; (2) she obtained and examined the report of proceedings and the common law record of the direct appeal; (3) she

reviewed the work product of the initial postconviction counsel and adopted her work product; and (4) she examined defendant's petition and concluded that his petition adequately presented his claims.

¶ 32    The parties presented arguments on the motion to dismiss in October 2022. However, the court reporter from this hearing stated in an affidavit that "[d]ue to a malfunction of [the] stenographic equipment," the original stenographic notes were unable to be deciphered and a "verbatim transcript" was unable to be produced. In December 2022, the trial court granted the State's motion to dismiss on the record and made the following findings.

> "In reading everything, it's – it's very clear that the Court at that time knew exactly how old he was. His age was mentioned throughout all of the hearings. His juvenile record was provided. They spoke about his five arrests from the time he was 13 years old. They went into great detail with each of those cases, the number of times he came in contact with the police.
>
> * * *
>
> The Court was really clear in listening to everything that everyone had to say about him being adopted, him missing his family. It appeared from everything that I have read that the Court took into consideration his age, took into consideration the amount of contact he had with the police, the amount of activity he was doing that was illegal, the fact that he didn't have a father. He missed his father. He was adopted.
>
> Everything was taken into account in terms of that, and the judge in the case was clear that society had to be protected from him and that the only rehabilitation that he had that would make him okay and would make him productive was for him to

stay in the criminal system and to continue to be locked up.

* * *

We look at the factors of [defendant's] incompetence or his inability to deal with the police. We know he can deal with the police because he dealt with the police in '83 when he had that first case. He dealt with the police when he was in the parking lot at Lane Tech. He dealt with the police in [1983] when he was in the apartment complex. He dealt with the police when he was in Los Angeles. He fled from the Chicago jurisdiction knowing that he was not supposed to be there, and he went there and was arrested after the death of his passenger. So that's definitely something that he was doing and knew exactly what he was doing. With regards to rehabilitation, again, the Court found that he was a dangerous individual. Society had to be protected from him but that he could use -- he could lead to some useful life in society as long as he remained in custody."

¶ 33    Defendant filed a timely notice of appeal from that order, and on appeal, defendant argues that he was deprived of the reasonable assistance of counsel because his postconviction attorneys improperly focused on pursuing a "frivolous" eighth amendment claim while failing to support his potentially meritorious claim under the proportionate penalties clause of the Illinois Constitution. The State maintains that postconviction counsel provided reasonable assistance.

¶ 34    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(a)(1) (West 2020)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Smith*, 2014 IL 115946, ¶ 22. Only one postconviction proceeding, however, is contemplated under the Act (*People v. Edwards*, 2012 IL 111711, ¶ 22), and a

defendant seeking to file a successive postconviction petition must first obtain leave of court (*People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). As a result, the bar against successive postconviction proceedings should be relaxed only when (1) a defendant can establish "cause and prejudice" for the failure to raise the claim earlier or (2) he can show actual innocence under the "fundamental miscarriage of justice" exception. *Edwards*, 2012 IL 111711, ¶¶ 22-23; *Smith*, 2014 IL 115946, ¶ 30. Under the cause and prejudice test, a defendant must establish both (1) cause for his or her failure to raise the claim earlier and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)). After the trial court grants defendant leave to file, the petition will be docketed for second-stage proceedings. *People v. Walker*, 2022 IL App (1st) 201151, ¶ 20.

¶ 35    At the second stage, the defendant may request counsel to be appointed to represent him or her, if necessary (725 ILCS 5/122-4 (West 2020)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2020)). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. See *People v. Sanders*, 2016 IL 118123, ¶ 37. If no such showing is made, the petition is dismissed. If a substantial showing of a constitutional violation has been shown, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2020). When considering a motion to dismiss at the second stage of proceedings, we accept as true all factual allegations that are not positively rebutted by the record. *People v. Johnson*, 2017 IL 120310, ¶ 14.

¶ 36    Here, defendant contends that his postconviction attorneys provided unreasonable assistance because both attorneys erroneously believed his natural life sentence was mandatory, rather than discretionary, and pursued a frivolous sentencing claim under the eighth amendment

to the United States Constitution (U.S. Const., amend. VIII). Defendant further asserts that his attorneys failed to pursue a potentially meritorious claim under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) based on his youth and attendant circumstances.

¶ 37    The right to counsel in proceedings under the Act is not a constitutional right, but strictly a matter of legislative grace derived from the Act. *People v. Huff*, 2024 IL 128492, ¶ 21 (citing *People v. Custer*, 2019 IL 123339, ¶ 30). Further, a postconviction defendant is entitled to only a reasonable level of assistance, which is a standard lower than that provided by the federal or state constitutions. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). The supreme court has said this distinction is rational because trial counsel plays a different role than counsel in postconviction proceedings. *People v. Addison*, 2023 IL 127119, ¶ 19 (citing *People v. Owens*, 139 Ill. 2d 351, 364 (1990)). "While a defendant is presumed innocent prior to trial, a postconviction petitioner has already been stripped of the presumption of innocence." *Huff*, 2024 IL 128492, ¶ 21. Further, postconviction counsel's role is to shape a postconviction petitioner's complaint into the " 'proper legal form and to present those complaints to the court' rather than to 'protect postconviction petitioners from the prosecutorial forces of the State.' " *Id*. (quoting *Addison*, 2023 IL 127119, ¶ 19).

¶ 38    To ensure that postconviction petitioners receive reasonable assistance, Rule 651(c) outlines the specific duties that postconviction counsel must follow in those proceedings. *Id*. ¶ 22. That rule provides that postconviction counsel file a certificate stating that he or she (1) consulted with the defendant to ascertain his contentions of the deprivation of a constitutional right, (2) examined the record of the proceedings at the trial, and (3) amended the defendant's *pro se* petition, if necessary, to ensure that defendant's contentions are adequately presented. Ill. S. Ct.

R. 651(c) (eff. July 1, 2017). Substantial compliance with the rule is sufficient. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 18. Once postconviction counsel has filed a Rule 651(c) certificate, a rebuttable presumption arises that postconviction counsel provided reasonable assistance. *Custer*, 2019 IL 123339, ¶ 32.

¶ 39    Postconviction counsel is not obligated to advance frivolous or spurious claims on defendant's behalf to satisfy the third requirement of Rule 651(c).  Any amendments to a *pro se* petition that would only further a frivolous or patently nonmeritorious claim are not necessary within the meaning of the rule. *People v. Greer*, 212 Ill. 2d 192, 205 (2004). The supreme court has "repeatedly held that the purpose of Rule 651(c) is to ensure that counsel shapes the petitioner's claims into proper legal form and presents those claims to the court." *People v. Perkins*, 229 Ill. 2d 34, 43-44 (2007) (citing *People v. Pinkonsly*, 207 Ill. 2d 555, 568 (2003), quoting *People v. Owens*, 139 Ill. 2d 351, 364-65 (1990)). Postconviction counsel is only required to investigate and properly present the defendant's claims. *People v. Smith*, 2022 IL 126940, ¶ 29 (citing *Pendleton*, 223 Ill. 2d at 47). Postconviction counsel is not required to search the record for issues not raised in the defendant's *pro se* petition. *People v. Rials*, 345 Ill. App. 3d 636, 641 (2003). A postconviction petitioner is "not entitled to the advocacy of counsel for purposes of exploration, investigation and formulation of potential claims." *People v. Davis*, 156 Ill. 2d 149, 163 (1993).

¶ 40    In this case, defendant was represented by two attorneys throughout these postconviction proceedings and each of the attorneys filed a certificate under Rule 651(c). As previously stated, defendant's initial counsel stated: that: (1) she had consulted with defendant by mail to ascertain his contentions of deprivations of his constitutional rights; (2) she had obtained and examined the Report of Proceedings of the trial; and (3) she had determined that the petition as it was written did not adequately represent defendant's constitutional claims and would be supplementing the

17

petition. Counsel then filed a supplemental petition adopting defendant's eighth amendment claim and adding the framework for that claim under *Miller*. When initial counsel retired, the successor counsel was appointed and she subsequently filed her Rule 651(c) certificate, stating that: (1) she consulted with defendant by letter to ascertain his contentions of deprivations of constitutional rights; (2) she obtained and examined the report of proceedings and the common law record of the direct appeal; (3) she reviewed the work product of the initial postconviction counsel and adopted her work product; and (4) she examined defendant's petition and concluded that his petition adequately presented his claims.

¶ 41    Since both postconviction counsel filed Rule 651(c) certificates, a rebuttable presumption has arisen that counsels provided reasonable assistance to defendant. See *Custer*, 2019 IL 123339, ¶ 32. The burden is on the defendant to overcome this presumption by demonstrating his postconviction counsel failed to substantially comply with the duties mandated by Rule 651(c). *People v. Addison*, 2023 IL 127119, ¶ 21. We review whether counsel substantially complied with Rule 651(c) *de novo*. *People v. Bass*, 2018 IL App (1st) 152650, ¶ 13. Under a *de novo* standard, we give no deference to the trial court's judgment or reasoning. *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 68. "*De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform." *Id*.

¶ 42    Defendant first claims that the Rule 651(c) certificates filed by his attorneys failed to comply with two of the three requirements of the rule. According to defendant, "[t]he lack of seriousness and diligence" in his counsels' representation was demonstrated by the filing of "form" Rule 651(c) certificates. He points to both attorneys stating in their respective certificates that they had each "obtained and examined the report of proceedings" from defendant's trial, despite his trial record being unavailable after having been destroyed in a flood. In a footnote, defendant

18

contends that his attorneys presumably "would have been absolved" of the responsibility of reading his trial transcript if they had noted the record had been destroyed in their Rule 651(c) certificates.

¶ 43     However, the supreme court has consistently held that under Rule 651(c), postconviction counsel is only required to examine as much of the record " 'as is necessary to adequately present and support those constitutional claims raised' " by the defendant. *Pendleton*, 223 Ill. 2d at 475-76 (quoting *Davis*, 156 Ill. 2d at 164). Despite the loss of the trial record, the relevant part of defendant's trial, his sentencing hearing, was available for review by postconviction counsels. Since counsels were able to obtain and examine defendant's sentencing hearing to review his postconviction claim, we find their Rule 651(c) certificates accurately reflected their ability to review the pertinent portion of the trial record.

¶ 44     Defendant further asserts that postconviction counsels' certificates "contradict" each other. He bases this assertion on statements made by each counsel in their certificates about whether defendant's petition adequately presented his claims. Initial counsel stated that defendant's *pro se* petition did "not adequately represent" defendant's constitutional claims and she "would be supplementing the petition." Counsel filed a supplemental petition to support defendant's eighth amendment claim. Subsequently, successor counsel filed her Rule 651(c) certificate, stating that she "concluded" defendant's petition "adequately presents his claim of a deprivation of his constitutional right." We find no contradiction because successor counsel also stated that she adopted the initial counsel's work product, which necessarily included the supplemental petition. Successor counsel simply found no further supplement or amendment was necessary. Neither of defendant's contentions suggest that either counsel failed to comply with Rule 651(c) and he has not rebutted the presumption that they provided reasonable assistance on this basis.

¶ 45    Defendant next argues that his counsels failed to amend his petition to set forth "his Illinois Constitutional claim," with any affidavits, records, or other evidence to support his "as applied" claim. His petition stated, in relevant part:

> "3.  Petitioner's rights under the Constitution of the United States and the State of Illinois were substantially denied in that:
>
> Petitioner's Eighth Amendment [*sic*] was violated when the Trial Court sentenced me to Natural Life +30years +30years +15years, for a total of 75 years (consecutive), for a crime committed at the age 16, without the sentencing judge giving meaningful consideration to my youth and its attendant circumstances."

¶ 46    Other than a general passing reference to the Illinois constitution, defendant did not specifically allege a violation under our state constitution. Nevertheless, our supreme court has observed that *pro se* petitions should be given a liberal construction. *People v. Myers*, 2023 IL App (1st) 210642, ¶ 45. Thus, we construe defendant's assertion of a claim under the Illinois constitution "with a lenient eye" that he intended to challenge his sentence under the proportionate penalties clause. (Internal citations omitted.) *Id.*

¶ 47    Since defendant was 16 years old at the time of the commission of the offenses, additional consideration related to his age is relevant to our review of his sentence because the sentencing of juvenile has been evolving in the country over the last several years. Beginning with *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court weighed in and set forth new constitutional parameters for the sentencing of juvenile offenders. See also *Graham v. Florida*, 560 U.S. 48, 68 (2010), *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012), and *Montgomery v. Louisiana*, 136 S. Ct. 718, 735-36 (2016). "[T]he United States Supreme Court has advised that 'children are constitutionally different from adults for purposes of sentencing.' " *People v. Lusby*,

2020 IL 124046, ¶ 32 (quoting *Miller*, 567 U.S. at 471). "The Court outlawed capital sentences for juveniles who commit murder in *Roper* and capital sentences for juveniles who commit nonhomicide offenses in *Graham*. And in *Miller*, the Court barred mandatory life sentences for juveniles who commit murder." *Id. Miller* has since been held to apply retroactively. *Montgomery*, 136 S. Ct. at 735-36. Since defendant's sentence was not mandatory but discretionary, *Miller* was inapplicable and his eighth amendment claim failed. But he maintains that his proportionate penalties claim had arguable merit and his attorneys were unreasonable for failing to develop this claim.

¶ 48    More specifically, defendant argues that his attorneys failed to investigate and amend his petition with supporting documents to demonstrate how his youth and "his youthful experiences and circumstances may have contributed to his criminal behavior." For support, he points to "red flags" from the sentencing hearing that indicated he "suffered through a particularly traumatic and troubled youth," such as, being placed for adoption, the subsequent dissolution of the marriage of his adoptive parents, and missing his adoptive father, as well as his use of drugs as a teenager and membership in a gang.

¶ 49    However, we first consider the viability of defendant's proportionate penalties claim following recent supreme court decisions. The supreme court in *People v Dorsey*, 2021 IL 123010, considered whether a proportionate penalties sentencing claim could be raised for the first time in a successive postconviction petition. There, a juvenile offender sought leave to file a successive postconviction petition, challenging his 76-year aggregate prison sentence based on *Miller*. The *Dorsey* court held "that *Miller*'s announcement of a new substantive rule under the eighth amendment [did] not provide cause for [the] defendant to raise a claim under the proportionate penalties clause." *Dorsey*, 2021 Il 123016, ¶ 74. "Illinois courts have long recognized the

21

differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' " *Id.*

¶ 50     Following *Dorsey*, our supreme court has repeatedly reaffirmed its conclusion. *People v. Clark*, 2023 IL 127273, ¶ 94 ("the *Miller* line of cases does not satisfy the 'cause' prong of the cause-and-prejudice test for raising a proportionate penalties claim in a successive postconviction petition, as *Miller*'s unavailability does nothing to explain why defendant neglected to raise the proportionate penalties clause claim in his prior postconviction proceedings."); *People v. Moore*, 2023 IL 126461, ¶ 40 (holding that *Miller* "does not provide cause for a young adult offender to raise a claim under the proportionate penalties clause" in a successive petition); *People v. Hilliard*, 2023 IL 128186, ¶ 28 ("*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause in a successive postconviction petition").

¶ 51     We are not persuaded by defendant's contention that since the postconviction court had granted him leave to file his petition, he necessarily established cause. In *People v. Bailey*, 2017 IL 121450, ¶ 26, the supreme court explained that the question of cause and prejudice remains applicable, and that the lack of cause or prejudice can support a second-stage dismissal. Even where the circuit court "determines that cause and prejudice have been adequately alleged and allows the petition to be filed," the State continues to "have an opportunity to seek dismissal of the petition on any grounds, including the defendant's failure to prove cause and prejudice for not having raised the claims in the initial postconviction petition." *Id.* The *prima facie* showing of cause required at the leave-to-file stage is a separate and lower burden than proving cause at second stage. See *id.*, ¶¶ 24-26. Since we are bound by the decisions of the Illinois Supreme Court (*People*

*v. Spahr*, 56 Ill. App. 3d 434, 438 (1978), defendant's proportionate penalties argument, pursuant to *Dorsey* and its progeny, could not have satisfied the requisite cause for a successive petition. Accordingly, defendant cannot rebut the presumption that his attorneys provided reasonable assistance when they did not raise this meritless claim.

¶ 52    Even if defendant could establish the requisite cause for a proportionate penalties claim, which we do not find, the record before us clearly shows that the sentencing court considered defendant's youth and its attendant circumstances in fashioning its sentence.

¶ 53    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "To succeed on a proportionate penalties claim, a defendant must show either that the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community ***." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009). Our supreme court has never defined what kind of punishment constitutes "cruel," "degrading,"," or "so wholly disproportioned to the offense as to shock the moral sense of the community" because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *People v. Leon Miller*, 202 Ill. 2d 328, 339 (2002). It is under this evolving societal standard that defendant contends that his natural life sentence, plus 75 years, shocks the moral sense of community.

¶ 54    As fully detailed above, the parties presented significant evidence in aggravation and mitigation. In addition to his murder of Totoni, the State detailed defendant's numerous crimes committed between the ages of 13 and 19, including the commission of attempted rape on an 84-year-old woman, the knife attack on Cooper, multiple burglaries in Los Angeles, and the stealing

of a vehicle from a car dealership that culminated in the death of his passenger as he attempted to flee from the police. In mitigation, defense counsel presented witnesses that highlighted defendant's difficulties in his childhood, including the trauma of adoption and his adoptive parents' divorce, and that defendant demonstrated good behavior while in jail. Counsel argued for the court to consider defendant's age and his rehabilitative potential. He asked the court to impose a sentence that would allow defendant to have the opportunity for release and a life outside of prison. The sentencing court acknowledged defendant's age on the record, but was not persuaded and specifically stated, "it is the articulated intention of this trial court that the [defendant] never, ever be released into society again." The sentencing court clearly considered defendant's youth and other mitigating evidence alongside the severity of the crime and found that the murder was "brutal, heinous, and indicative of wanton cruelty." The court then imposed a natural life sentence within the statutory range. See Ill.Rev.Stat.1989, ch. 38, par. 1005-8-1(a)(1) (" if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty *** the court may sentence the defendant to a term of natural life imprisonment."). This sentence was upheld on direct appeal. See *Saunders*, 235 Ill. App. 3d at 673. Given this record, a proportionate penalties claim would have lacked merit and postconviction attorneys did not provide unreasonable assistance by failing to develop this claim.

¶ 55    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 56    Affirmed.